UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

FERDINAND C. GRAHAM,

           Plaintiff,

-vs-                                               Case No. 5:04-cv-167-Oc-10GRJ

WAL-MART STORES, INC., a foreign
corporation,

           Defendant.
_____

## O R D E R

In this employment discrimination action, the Plaintiff alleges that during his employment with the Defendant, the Defendant intentionally discriminated against him on the basis of his race by failing to provide him with access to the cash register and computer; by precluding him from counseling subordinates when other white employees were provided these privileges; by maintaining a racially hostile work environment; and by wrongfully terminating the Plaintiff, all in violation of the Florida Civil Rights Act.[1]

The Defendant has moved for Summary Judgment (Doc. 13) and argues that: (1) the Plaintiff cannot establish that he suffered an adverse employment action; (2) the Plaintiff cannot demonstrate that he was treated differently than similarly situated employees outside his protected class; (3) the Plaintiff cannot show a causal connection between his race and the alleged disparate treatment; (4) the Defendant has offered legitimate, non-

---

      [1] Fla. Stat. § 760.01 *et seq*. The Plaintiff does not allege a federal claim. Jurisdiction is predicated on diversity of citizenship.

discriminatory reasons for its actions and the Plaintiff cannot show that these reasons were pretext for discrimination; (5) the statements made by the Plaintiff's co-workers were not sufficiently severe or persuasive to create a hostile work environment; (6) the Plaintiff has no basis to hold the Defendant liable due to the statements; and (6) the Plaintiff cannot establish a claim of pattern and practice of race discrimination because he has not presented statistical proof of a pattern of discrimination.

For the reasons that follow, the Court finds that the Defendant's motion for summary judgment is due to be granted in part and denied in part.

## BACKGROUND

The Plaintiff, Ferdinand Graham, an African-American, began working as a technician in Wal-Mart's Tire and Lube Express (TLE) Department in Ocala, Florida on November 2, 2001.[2] On October 5, 2002, Mr. Graham was promoted to the position of TLE Service Manager at a Wal-Mart in Summerfield, Florida.[3] The first day that Mr. Graham worked at the Wal-Mart in Summerfield, Danny Kennedy, a Wal-Mart District Manager, took Mr. Graham aside and told him he was doing a good job and that there was service manager position open if he was interested.[4] But Mr. Kennedy cautioned Mr. Graham to

---

[2] Doc. 15, Deposition of Ferdinand Green, pg. 49; Doc. 13, Part 2, Hourly Associate Information Sheet; Doc. 25, Joint Pretrial Statement, Statement of Admitted Facts.

[3] Doc. 15, Deposition of Ferdinand Green, pg. 53; Doc. 13, Part 3, Associate's Commendation Form. The Plaintiff stated that he worked at the Wal-Mart in the Villages – the Villages is near Summerfield, Florida.

[4] Doc. 15, Deposition of Ferdinand Green, pg. 54, 139.

"look around the shop" and "see what you're up against." He told Mr. Graham that he would be the only minority in the shop, but he would "stand with [Mr. Graham] all the way."[5]

Mr. Graham testified that Mr. Kennedy's comments were not the first time race was brought up to him by an employee at Wal-Mart. While Mr. Graham was working in the Ocala Wal-Mart, one of his co-workers told him "to get back on the other side of the shop; there ain't no niggers allowed on this side of the shop."[6] Mr. Graham made a formal complaint about this statement to Walter McClennon, who "jumped right on it" and "took care of that pretty quick."[7] In addition, while working at the Summerfield Wal-Mart, after he asked Mandi Walker, a TLE Service Technician, to do something for him, she said "I'm not going to do what no nigger bait or nigger boy say do."[8] Mr. Graham testified that he told Willie Harris, the TLE Manager and his supervisor, about this statement, and Mr. Harris stated "we won't have that . . . I'll deal with that as soon as we get back."[9] Mr. Graham testified that he also heard Ms. Walker make another statement concerning his race – she

---

[5] Id. at 54-55.

[6] Id. at 57.

[7] Id. at 122-123.

[8] Id. at 68. Ms. Walker denied she made any racial remarks to Mr. Graham or heard anyone else make such remarks. Doc. 15, Deposition of Mandi Walker, pg. 49-50.

[9] Id. at 123-124. Mr. Harris testified that at no time did Mr. Graham complain to him about any racial comments made to him by a TLE employee. Doc. 15, Part 22, Affidavit of Willie Harris. Willie Harris was the TLE Manager and Mr. Graham's supervisor while Mr. Graham worked at the Wal-Mart in Summerfield from October 2002 through January 2003. Id.

told an employee "I wish that nigger would go somewhere else."[10] The last statement concerning race that Mr. Graham recalled was made by another Wal-Mart employee who told Mr. Graham that he had watched the movie "Roots" and that now he understood "why we used to do y'all the way that we did."[11] In response, Mr. Graham told Patrick Walls, the TLE Manager and Mr. Graham's supervisor after Mr. Harris, about the statement, and Mr. Walls was supposed to "coach"[12] the employee, but Mr. Graham testified that he did not think the employee was ever coached.[13]

During his deposition, Mr. Graham explained how Wal-Mart created a hostile work environment:

> By me being a human being or a person at all and being in a position as being a leader and to have people running all over the shop calling you nigger, black man, being – having all kinds of issues turning at you with people throwing stuff; people coming to you and saying, we seen the movie Roots and now understand why we used to do y'all the way that we did, smile and walk off;

---

[10] Doc. 15, Deposition of Ferdinand Graham, pg. 136. Mr. Graham did not tell management about this statement. Id. at 137.

[11] Id. at 120. In addition to this statement, one of Mr. Graham's supervisors called him a "wrinkle head," apparently due to the wrinkles on the back of his head, and not his race. Id. at 121.

[12] A "coaching" can be verbal or written and is where a Wal-Mart employee is "coached" to improve so that he or she does not go down the same path again; it is where a manager sits down and talks with an employee about the problem. "Decision day" is where an employee is sent home for the day to think about whether they would like to keep their job and come back the following day. When the employee returns, he or she is supposed to bring an action plan on how they are going to become a better employee and handle whatever problem they may have. Doc. 15, Deposition of Andrea Orlow, pg. 71-73.

[13] Doc. 15, Deposition of Ferdinand Graham, pg. 125. Mr. Wall confirmed that Mr. Graham spoke to him about the "Roots" statement and informed the employee who made the statement that such comments were not appropriate. Doc. 15, Part 23, Affidavit of Patrick Wall.

and cussing me out on many occasions in front of customers, challenging my leadership in front of the customers. And then go to my superior managers and nothing is done, to me, that's some type of hostil[e] work area.[14]

As the TLE Service Manager, Mr. Graham's "primary responsibilities" included providing customer service; promoting service area sales; recruiting, hiring, and training service technicians; using "Coaching for Success/Improvement" on a daily basis with service technicians; conducting performance appraisals of service technicians; remaining knowledgeable in all areas in the service department; maintaining the service area; providing a safe work area; and setting aggressive goals for the service area.[15] Some of Mr. Graham's specific responsibilities included assisting in the "coaching for improvement process by making recommendations, conducting research, [and] participating in coachings"; organizing the tire and battery cage; and ordering supplies, including oil filters and tire weights.[16]

Mr. Graham testified that he was the only minority in the entire TLE Department,[17] and that he was treated differently than his Caucasian counterparts – so much so, that he was unable to effectively perform the duties described in Wal-Mart's TLE Service Manager job description, including ordering supplies and keeping the tire and battery cage

---

[14]   Doc. 15, Deposition of Ferdinand Graham, pg. 109-110.

[15]   Doc. 19, Part 7, TLE Service Manager Position Responsibilities.

[16]   Id.; Doc. 19, Part 8, Job Description Tire Lube Express Service Manager.

[17]   Doc. 15, Deposition of Ferdinand Graham, pg. 105.

organized.[18]  Mr. Graham testified that Jim Martin, another technician he worked with at Wal-Mart, was treated better than he was.[19]  Mr. Martin ordered stock and "had access and had numbers to everything, had keys to everything."  Mr. Graham stated that Mr. Wall allowed everyone in the shop, except for him, to have access to the "cage" – where "junk batteries," "junk tires," or merchandise was stored – when only managers were supposed to have access.[20]  In fact, Ms. Walker testified that when she became the TLE Service Manager after Mr. Graham, she was given a key to the cage.[21]  Mr. Graham eventually received a key to the cage from one of his subordinates and reported his concerns to his supervisors.[22]  In addition, Mr. Graham claimed that he did not have access to the cash register and computer, when another Caucasian TLE Service Manager (Jeff Sanders) was given access codes to allow him to order such items as oil filters, plugs, and tires.[23]  Wal-Mart management disputes Mr. Graham's allegations and claims that there were no access

---

[18]    Doc. 19, Part 1, Affidavit of Ferdinand Graham.

[19]    Doc. 15, Deposition of Ferdinand Graham, pg. 70.

[20]    Id. at 72-73.

[21]    Doc. 15, Deposition of Mandi Walker, pg. 36.  After Mr. Graham was terminated, Ms. Walker and Robert Clements (both Caucasian) were promoted from the position of TLE Service Technician to TLE Service Manager.  Doc. 15, Part 23, Affidavit of Patrick Wall.

[22]    Doc. 15, Deposition of Ferdinand Graham, pg. 73.  Ms. Orlow also testified that other service managers have access to keys for the cage.  Doc. 15, Deposition of Andrea Orlow, pg. 94-95.  Mr. Harris testified that only "support managers" were given access to the tire and battery cage.  Doc. 15, Part 22, Affidavit of Willie Harris.

[23]    Doc. 15, Deposition of Ferdinand Graham, pg. 101-104; Doc. 19, Part 1, Affidavit of Ferdinand Graham.

codes for the computers outside, an employee simply had to enter his social security number, and TLE Service Managers are not responsible for operating the cash register, therefore they do not need access.[24]  Lastly, Mr. Graham testified that he was also precluded from counseling subordinates.[25]  But according to management, hourly supervisors do not conduct coaching, they only participate in the coaching,[26] which Mr. Graham was given the opportunity to do.[27]

In his deposition, Mr. Graham described the series of events leading up to his termination on June 6, 2003 as follows.[28]  Mr. Graham brought a customer into the shop, who also happened to be a minority,[29] while he inspected the tires on the customer's vehicle.  He then escorted the customer out of the shop.  Mandi Walker, a service technician, saw the customer in the shop while Mr. Graham was looking for new tires for the customer's vehicle.  Ms. Walker saw the customer in the shop and told him he was not allowed in the shop.  The customer said he was just in the shop with the service manager (Mr. Graham) and the manager said that he could be in the shop.  Ms. Walker then told the

---

[24]  Doc. 15, Deposition of Andrea Orlow, pg. 46, 48-49; Doc. 15, Part 22, Affidavit of Willie Harris; Doc. 15, Part 23, Affidavit of Patrick Wall.

[25]  Doc. 15, Deposition of Ferdinand Graham, pg. 106.

[26]  Doc. 15, Deposition of Andrea Orlow, pg. 70.

[27]  Doc. 15, Part 23, Affidavit of Patrick Wall.

[28]  Doc. 15, Deposition of Ferdinand Graham, pg. 76-92; Doc. 15, Deposition of Mandi Walker, pg. 67-76.

[29]  Doc. 15, Deposition of Ferdinand Graham, pg. 113.

customer he could not be in the shop without a Wal-Mart employee escorting him and directed him to leave the area, which he did. Ms. Walker, under the direction of Patrick Wall, then wrote a report about the incident. While Ms. Walker was writing her incident report, Mr. Graham approached her and asked her what she was doing. She told him she was writing a report, and Mr. Graham told her "you go ahead and write whatever you have to write . . . because God ain't going to allow nothing to happen to me . . . that he can't stop . . . that's not meant to be."[30] Shortly thereafter, Ms. Walker wrote a report about Mr. Graham approaching her and making comments while she was writing an incident report. She stated that Mr. Graham "stood over [her] shoulder trying to read [her previous incident report] and started to question the statement." She further reported that she "was using the open door policy and [she] felt he stepped the boundaries with questioning me."[31] Ms. Walker "found it not to be professional for a service manager to drill or to keep making rude comments about what I had done on being concerned with the company, policies, and

---

[30] Mr. Graham's recollection of the events is corroborated by Ms. Walker's testimony. Ms. Walker testified that Mr. Graham approached her while she was writing her report and asked her if she was writing about him. Ms. Walker stated that Mr. Graham told her in an "agitated and inquiring" tone that he knew she was writing about him and "it's okay, do what you have to do." Ms. Walker testified "[a]nd by that right there it was making me feel bad knowing that I'm not trying to get anyone in to trouble. It was me doing what my job description was." Ms. Walker further stated that Mr. Graham's statement made her feel "[a] little intimidated and a little bothered by it as far as someone's trying to make me feel bad for what I'm doing." Doc. 15, Deposition of Mandi Walker, pg. 76-77, 81. Ms. Walker also testified that after she wrote the incident report, Mr. Graham approached her in the shop and continued to say things like "why are people against me?" Id. at 103-104. See also Doc. 15, Part 21, Incident Reports by Mandi Walker.

[31] "The Open Door Communications policy allows all Wal-Mart associates the opportunity to bring suggestions, observations, problems or concerns regarding the company or themselves to the attention of any supervisor." Doc. 15, Part 23, Affidavit of Patrick Wall.

most of all the customer."[32]   Thereafter, Mr. Graham was told to report to the manager's office to meet with several members of management.  Apparently, the managers took issue with Mr. Graham "jump[ing] all over [Ms. Walker's] case and sa[ying] some negative things to her" after she was told by a manger to write up an incident report.  Mr. Graham was told that he was going to be demoted and transferred.  Mr. Graham was then asked to confirm on Wal-Mart's computer system Ms. Walker's statement, which he refused to do because it was not the truth.[33]  According to management, Mr. Graham thought this whole situation was a "racial thing" (Mr. Graham agrees that his termination was based on race) and Mr. Graham was given an opportunity to explain his side of the story (which Mr. Graham disputes).[34]  Thereafter, Mr. Graham was terminated for "gross misconduct." According to Mr. Graham's "Exit Interview" form, he was terminated because he "violated [the] open door policy," and he "[w]as given [a] written coaching . . . and [he] refused to sign [the] coaching."[35]

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any

---

[32]   Doc. 15, Part 21, Incident Reports by Mandi Walker.

[33]   According to Mr. Wall, Mr. Graham was asked "to acknowledge the behavior expected," but he refused to do so. Doc. 15, Part 23, Affidavit of Patrick Wall.

[34]   Doc. 15, Deposition of Andrea Orlow, pg. 88-90.

[35]   Doc. 15, Part 9, Exhibits to Ferdinand Graham's Deposition, Exit Interview.

material fact and that the moving party is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party."[36]  As the Supreme Court held in Celotex Corp. v. Catrett, the moving party bears the initial burden of establishing the nonexistence of a triable fact issue.[37]  If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove."[38]  The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried.[39]

## DISCUSSION

The Plaintiff pursues his race discrimination claim under several different theories, including: (1) disparate treatment; (2) discriminatory discharge; and (3) hostile work environment.[40]  The Court will address each theory in turn.

---

[36]   Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).

[37]   477 U.S. 317 (1986).

[38]   Rollins v. Techsouth, 833 F.2d 1525, 1528 (11th Cir. 1987).

[39]   Celotex, 477 U.S. at 324.

[40]   During the course of the pretrial conference, which was conducted on October 19, 2005, the Plaintiff notified the Court that although evidence may be offered at trial concerning a

(continued...)

*I. Disparate Treatment*

To prevail on a disparate treatment claim under the Florida Civil Rights Act,[41] the Plaintiff must show: (1) he is a member of a protected class, (2) he was qualified for the job or benefit at issue, (3) he was subjected to an adverse employment action, and (4) his employer treated similarly situated employees who were not members of his protected class more favorably.[42]

The Plaintiff has failed to establish a prima facie case of disparate treatment because he has not shown that he suffered an adverse employment action (the Plaintiff's termination is addressed below). To prove an adverse employment action, the Plaintiff "must show a serious and material change in the terms, conditions, or privileges of employment."[43] "[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be

---

[40](...continued)
pattern and practice of the Defendant in relation to minority employees, pattern and practice will not be pursued as a separate claim or legal theory warranting any relief. Accordingly, it is not necessary for the Court to address the viability of a pattern and practice claim by the Plaintiff.

[41] "Florida's Civil Rights Act is patterned after Title VII, and thus federal case law dealing with Title VII is applicable to employment discrimination claims brought under Florida law." Manniccia v. Brown, 171 F.3d 1364, 1368, n.2 (11th Cir. 1999) (citing Florida Dep't of Cmty. Affairs v. Bryant, 586 So.2d 1205, 1209 (Fla. 1st DCA 1991).

[42] Rice-Lamar v. City of Ft. Lauderdale, Fla., 232 F.3d 836, 842-43 (11th Cir. 2000); Manniccia, 171 F.3d at 1368.

[43] Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001).

materially adverse as viewed by a reasonable person in the circumstances."[44]  "[T]he asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment."[45]  "A tangible employment action is 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"[46]

The Plaintiff argues that the following limitations and restrictions on his terms, conditions, and privileges of his employment constitute adverse employment actions by the Defendant:  (1) the Plaintiff was not given access to the tire and battery cage, computer, or cash register; and (2) the Plaintiff's supervisors dismissed his complaints about inappropriate behavior by his subordinates and undermined his decision-making authority.  The Court is not persuaded by the Plaintiff's arguments.  The Plaintiff's lack of access to the tire and battery cage, computer, and cash register, and the lack of support by his supervisors did not significantly change his status as a TLE Service Manager.[47]  There is no evidence the Plaintiff's pay or benefits were affected by these conditions.  And although the Plaintiff's responsibilities, as outlined in Wal-Mart's TLE

---

[44] Id.

[45] Id.

[46] Johnson v. Booker T. Washington Broad. Serv., 234 F.3d 501, 512 (11th Cir. 2000) (quoting Burlington Indus, Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).

[47] It should be noted that the Plaintiff cites no authority which suggests that these types of restrictions on the terms or conditions of employment constitute adverse employment actions.

Service Manager job description, may have been somewhat limited, it appears that the Plaintiff was able to perform most of his essential job functions despite these limitations. Accordingly, summary judgment with respect to this claim is due to be granted.

## II. *Discriminatory Discharge*

To succeed on his discriminatory discharge claim, the Plaintiff must show: (1) that he is a member of a protected minority, (2) that he was qualified for the job from which he was discharged, (3) that he was discharged, and (4) that his former position was filled by a non-minority.[48] Once a prima facie case is established, a presumption of unlawful discrimination arises.[49] An employer may rebut the presumption of discrimination by articulating legitimate, non-discriminatory or non-retaliatory reasons for taking the adverse employment action or actions.[50] If the employer is successful on this score, the presumption disappears from the case, and the plaintiff is left with the ultimate burden of convincing the fact finder that a discriminatory or retaliatory reason more likely than not motivated the employment action.[51] To avoid summary judgment, however, the plaintiff must produce evidence sufficient to create a genuine issue of fact that the reasons proffered by her employer are merely pretext for unlawful

---

[48] Edwards v. Wallace Cmty. Coll., 49 F.3d 1517, 1521 (11th Cir. 1995).

[49] Walker v. Prudential Property and Cas. Ins. Co., 286 F.3d 1270 (11th Cir. 2002).

[50] Bass v. Bd. of County Comm'rs, Orange County, Fla., 256 F. 3d 1095, 1119 (11th Cir. 2001).

[51] Johnson, 234 F.3d at 507 n.6.

discrimination or retaliation.[52]  "[T]o directly attack [the Defendant's] reasons, [the Plaintiff] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find [all of those reasons] unworthy of credence."[53]

The Plaintiff has established a prima facie case.  He is African-American, a protected minority, and his supervisors testified that before he was terminated, he was never disciplined or demoted, and received positive performance evaluations.  In addition, Mandi Walker and Robert Clements, both Caucasian, were promoted to TLE Service Manager positions after the Plaintiff was terminated.

Since the Plaintiff has established his prima facie case, the burden shifts to the Defendant to present legitimate, non-discriminatory reasons for the discharge.  The record reflects that the Plaintiff was terminated for violating Wal-Mart's "Open Door Communications" policy and for refusing to acknowledge his behavior during his "coaching" session, thus satisfying the Defendant's burden and requiring the Plaintiff to present evidence that the Defendant's legitimate reasons for his termination are pretext for discrimination.  The Plaintiff claims that the Defendant's failure to follow its own procedures and properly respond to the Defendant's complaints of race discrimination,

---

[52] Id.

[53] Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1333 (11th Cir. 1998) (internal quotations and citations omitted).

the Defendant's failure "to employ a sufficient number of blacks as officials, managers or professionals," the Defendant's failure to properly investigate the incident leading up to his termination, and the Plaintiff's unreasonable termination demonstrate the existence of a genuine issue of material fact about the Defendant's alleged intent to discriminate against the Plaintiff on the basis of his race.

Accordingly, the Court concludes that summary judgment with respect to this claim is due to be denied.

*III. Hostile Work Environment*

To establish a hostile work environment claim, the Plaintiff must show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment was based on a protected characteristic of the Plaintiff; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability."[54] The fourth requirement, that the harassment must be sufficiently severe or pervasive to alter the terms or conditions of employment, contains both an objective and a subjective component; thus, "this behavior must result in both an environment 'that a reasonable person would find hostile or abusive' and an

---

[54] Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).

environment that the victim 'subjectively perceive[s] . . . to be abusive.'"[55]  In evaluating the objective severity of the harassment underlying the Plaintiff's hostile work environment claim, the Eleventh Circuit considers, among other factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."[56]  The "mere utterance of an . . . epithet which engenders offensive feelings in an employee . . . does not sufficiently affect the conditions of employment."[57]  "[R]acial slurs allegedly spoken by co-workers ha[ve] to be so 'commonplace, overt and denigrating that they create[] an atmosphere charged with racial hostility.'"[58] The law is only violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[59]

The Plaintiff claims that the four racial slurs made by his co-workers, and the one statement made by a manager warning him that he would be the only minority in the

---

[55]   Id. (citations omitted).

[56]   Id.

[57]   Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (internal quotations and citations omitted).

[58]   Edwards, 49 F.3d at 1521 (quoting EEOC v. Beverage Canners, Inc., 897 F.2d 1067, 1068 (11th Cir.1990)).

[59]   Harris, 510 U.S. at 21 (internal quotations and citations omitted).

Department, were sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment.  The Court disagrees.  The statements made by the Plaintiff's co-workers, occurring over the course of the Plaintiff's approximately nineteen months of employment with the Defendant, were isolated in nature and sporadic, and was not the kind of harassment which was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.[60]  Accordingly, summary judgment with respect to the Plaintiff's hostile work environment claim is due to be granted.

## CONCLUSION

Upon due consideration, and for the foregoing reasons, it is ordered that:

(1) the Defendant's motion for summary judgment (Doc. 13) is granted with respect to the Plaintiff's disparate treatment and hostile work environment claims, and denied with respect to the Plaintiff's discriminatory discharge claim; and

(2) the Clerk is directed to withhold the entry of judgment pending resolution of this case as a whole.

---

[60] In Barrow v. Georgia Pacific Corporation, in an unpublished opinion, which may be cited as persuasive authority, the Eleventh Circuit held that an employee did not present evidence that the workplace was permeated with discriminatory intimidation, ridicule, and insult so that it was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment. 144 Fed. Appx. 54, 57-58 (11th Cir. 2005).  Rather, the dozen or so instances of racial slurs and racial symbols that the employee confronted at work were "isolated, sporadic instances of racial harassment over his more than fourteen years of employment." Id. at 58.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 27th day of October, 2005.

_____
UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record